Price, J.
Respecting the rights of the contesting parties, the common source of title is Willard P. Umbenhower. Lee and Plazel Umbenhower, without dispute, are his heirs, and the controversy turns upon the legitimacy of the child, Grace Helen.
Her mother Margaret was not married to Willard P. Umbenhower under a license and statutory ceremonials — under the forms provided by statute; but, it is asserted that they entered into a solemn contract of marriage to take effect in praesenti, which was accomplished and followed by cohabitation as man and wife with notice to the society in which they moved and by announcement on all proper occasions that they sustained that relation to each other.
This method of matrimony is called a common law marriage as distinguished from that prescribed by statute. A contract of marriage is essential in either case. The performance of a mere ceremony does not constitute a marriage. It must follow and be founded on contract. In one *244 case the consummation of the contract may be celebrated and observed with or according to • statutory ceremony. In the other, the evidence of the marriage, in part at least, consists in the immediate and continued course of conduct of the parties in reference to each other in their domestic and social life. The contract of marriage need not be in writing in either, but may exist in parol. If it is ceremonially solemnized, the evidence of its consummation may be made a matter of record, if authorized by statute, and may be proved by eye witnesses, .admissions, cohabitation, etc., if the record evidence is not made, or if made, is lost or destroyed.
So it would seem that marriage rests on contract, and the state recognizes it as a civil contract, and it may be proved by competent parol proof and circumstances when the degree of proof is clear and satisfactory to the court or jury.
In this case the evidence to sustain the contract of marriage is within a small compass. The contracting parties were of lawful age and competent to contract. The first wife of Willard P. was divorced from him in the year 1900, and it may be inferred from statements in the record that part of her case for divorce was the husband’s friendship for Margaret, afterwards the mother of Grace Helen, defendant in error. Attention to the evidence of this mother will be pertinent at this point. She testified that in May after the divorce, “he (Willard P.) said to me: ‘Mag, you got the blame and we might as .well have the game — We’ll be married.’ It went on then till in May. * * •* *245 Billy then said to me: 'The court won’t give us no license,’ and he took my hand and he said, T pledge myself as true and lawful husband to you the longest day I live,’ and I said to Billy, T pledge myself as true and lawful wife to you the longest day I live,’ and he slipped his mother’s wedding ring on my finger, and he kissed me, and he said, 'If we ever have any children, they will hold us together.’ ” This ring was put in evidence. She says this conversation occurred in his room in Park Row, Massillon. She was a laundress in the hotel and he was a barkeeper at the same place.
The terseness and precision of the above language almost staggers belief, for it would, on first-impression, seem inconceivable that persons of such walk in life would be capable of selecting and adopting such apt language to express their contract of marriage. The language resembles some we have seen in the law books on the subject. No one was present to corroborate or deny what the witness said, and if there were no circumstances of corroboration, a court might hesitate in believing the story to such degree as to determine important interests resting solely on its verity. But the same witness gives another incident that has some force. After the birth of this child on October 3, 1902, its name and date of birth were written by Willard P. i.n a Bible that was in the possession of one or both of the parties. Not long after the alleged contract, the woman gave up her position in the laundry, and after a change of rooming place, she devoted herself to Willard as *246 his housekeeper, and they continuously cohabited as man and wife and held themselves out to the public as husband and wife. To neighbors with whom they associated, he introduced her as his wife, and she as often spoke of him to people they met, as her husband. After the birth of this child, Willard treated and spoke of it as his child, and to all outward appearances it was cared for by him as he would naturally care for his own offspring, and all this continued until his death.
Both lower courts found the above and some additional circumstances, to be the facts, and that they made proof of a common law marriage, and that Grace Helen was and is a legitimate heir of the parties to such marriage. While the narrative of the mother is not above suspicion and lacks conviction beyond doubt, we cannot say the lower court was clearly wrong in founding its judgment on the evidence adduced and found in the record. If true, there was a contract of marriage per verba de praesenti and the event was followed consistently by the usual indicia of the marriage relation.
Courts of Ohio and elsewhere have frequently considered cases where the rights of a party rested on so-called common law marriage. These cases are cited in the briefs and we will not repeat them here. The subject is not new in Ohio. As early as the case of Duncan v. Duncan, 10 Ohio St., 181, it was decided that “mutual promises to marry in the future, though made between parties competent to contract, and followed by cohabitation as husband and wife, is not, in itself, a valid marriage.” This was not the precise question in the *247 present case, and the court distinctly states in the opinion that it was not passing on such question as we have. It was treating the case where the mutual promises were to marry in the future, and not the agreement to marry at once, followed by cohabitation as husband and wife.
The validit)^ of a marriage without complying with statutory requirements, was considered in Carmichael v. The State, 12 Ohio St., 553. There it appeared that the person who solemnized a marriage had no license or authority under the laws of the state. There was no other objection to the form of the marriage, and thereafter the parties cohabited as husband and wife. Held: “That it was to be inferred from the statement that the parties openly and mutually consented to a contract of present marriage, then to become husband and wife, and thereafter cohabited as such, and that this constituted a legal marriage, and the man, having then a wife living, might, on proof of such second marriage, be properly convicted of bigamy.”
In the same report, is Wright v. Lore, 619, which recognizes a similar doctrine.
So, also, is Lawrence Railroad Co. v. Cobb, 35 Ohio St., 94. The application of the statute of limitations to married women was one of the issues, it being urged that there was no proof of marriage. On page 97, Mcllvaine, J., says: “The issue as to the plaintiff’s marriage was important in the case only as it related to the defense under the statute of limitations. The testimony showed that the plaintiff and Mr. Cobb had been living and *248 cohabiting as husband and wife for many years previous to the construction of the railroad, and had been regarded and treated in the neighborhood as husband and wife down to the date of the trial below. Upon such evidence the jury was warranted in finding the marriage, and the court did not err in its instructions on this point.”
Again, in Bruner v. Briggs, 39 Ohio St., 478, this court said, in the first paragraph of the syllabus: “In an action by one as surviving husband, against the heir of a deceased wife, to recover an estate by the curtesy, where the marriage is put in issue, a marriage in fact may be established by showing that they lived together and cohabited as husband and wife for a series of years, that they always recognized and treated each other as such, and that they were so treated and reputed in the community and circle in which they moved, although no record evidence was offered, nor the evidence of any witness who saw .them married was given. Such is competent and its sufficiency to establish the fact of marriage is for the court or jury trying the issue to determine.” See, also, Ives v. McNicholl, 59 Ohio St., 402.
The facts of each of the above cases are not as strong in support of the alleged marriage as in the case at bar, if credit be given to testimony. We cannot say that the lower court was palpably mistaken in giving such credit. We have brought the cases together in this opinion in order that the course of decision adopted by this court might stand for comparison. It is apparent from these and other cases before this court, the validity of a *249 so-called common law marriage has never been repudiated, when established by sufficient competent evidence, but has been clearly recognize. Indeed the history of civilized society will show that in primitive times and all down the line of its advancement, marriage relations were created by mutual contract of competent parties, without ecclesiastical or statutory ceremony. While it is true legislatures from time to time have endeavored to prescribe methods and formalities of marriage, and proper records of the same, in the interest of decency and good morals, and to thus exalt and make sacred the married state, it cannot be forgotten that no law has made such methods and formalities exclusive. In this respect, as in many others, there is always a stratum of society that prefers to shun or disregard legal ceremonies and adopt a coarser and less conspicuous way of forming domestic ties. It is the innocent offspring of such citizens that the law would mercifully protect, and rather call them heirs than bastards.
We know that recognizing such informal marriages is fraught with danger, and that the rule is susceptible of great abuse. This view led Brinkerhoff, C. J., to exclaim, in Duncan v. Duncan, supra, 188, in reference to a contract to marry in the future: “It would be alien to the customs and-ideas of our people, and would shock their sense of propriety and decency. That it would tend to weaken the public estimate of the sanctity of the marriage relation; to obscure the certainty of the rights of inheritance; would be opening a door to false pretenses of marriage and to the imposition *250 of supposititious heirs and would place honest, God-ordained matrimony and mere meretricious cohabitations too nearly on a level with each other.” This observation of the learned chief justice, and the like claim of counsel for plaintiff in error, are well calculated to incite great caution on the part of the courts in considering the evidence in such cases, for perjury and fraud practiced on the court or jury may change or defeat inheritance to valuable property, or otherwise affect important property interests and even the social relations.
However, the fear is not sufficient to defeat a marriage fairly established by competent evidence. True, perjury and fraud may taint such testimony and not be discovered by the most alert court or intelligent jury. The case may be won by fraud and perjury practiced. This has occurred in perhaps all classes of cases. We hope the instances are rare, but we have been told in legal history, that not only property rights, but human life and liberty, have suffered from the force of fraud and perjury.
We have taken a comprehensive view of this case, and have examined its facts closely, as should always be done in such an important issue, and find no error in the record.

Judgment affirmed.

Davis, C. J., Shauck and Johnson, JJ., concur. Donahue, J., not participating.